United States v. Donaldson. Let's let Ms. Middleman get away and then we'll start. Okay, Mr. Fallgatter, is that how you pronounce your name? Okay, I had it on the sheet before me the opposite way, but that's fine. Mr. Ray, will you come and speak with us? You represent Crithfield. Yes, Your Honor, and good morning. May it please the Court. My name is Gordon Ray and I represent Dwayne Crithfield. Mr. Fallgatter represents Stephen Donaldson. And we would ask if we could have ten minutes for our opening argument, my taking five and him taking five. Got it. And five for rebuttal, myself taking two of those and him taking three. You've got it. Thank you, sir. Just to cut right to the big issue in this case, I view it as whether or not the government adduced sufficient evidence to prove beyond a reasonable doubt, first, that the business protection plan, an insurance product, ran afoul of the tax laws, and secondly, if it did, whether it had proven beyond a reasonable doubt that my client, Mr. Crithfield, knew that and yet continued to market it with the specific intent of defrauding the United States. Addressing those at what I think is a core issue with respect to the business protection plan, that business protection plan was reviewed over the years by three of the country's top tax firms. Except that when it was reviewed by those tax firms, they were not given complete and correct information, were they? We believe that they were, Your Honor. Why did one of the firms withdraw its opinion after it learned more facts? The one firm, well, Morris Manning never withdrew its opinion. Lord Bissell Brook ultimately withdrew its opinion because a second reviewing attorney with that firm was unfamiliar with the nature of accounting that was done for this tax structure. And the entities that owned the structure were actually not in the U.S., but were in the Caribbean and used a different method of accounting. And so that firm backed out. When they did, then my client went to yet another firm, Handler Thayer & Duggan in Chicago, and they reviewed the entire structure. They suggested some tweaking, which my client implemented, and things continued from there. And so I believe as far as the record shows, and again we have the direct sites in our brief, the three different firms approved the structure. One of them had some questions, but those were cleaned up with the third firm that took a close look. Something like 100. Well, let me ask you something because my understanding is that that opinion relied on FIC's representations and on the assumption that FIC and the guarantee company would be adequately capitalized, maintain adequate reserves, and have sufficient economic substance and financial resources to perform their obligations. Do you disagree that those were representations on which that opinion relied? I agree with that, yes. And also the opinion related that the risks that will be insured under the policy are solely risks of the company and are not risks of the grantor. Do you agree with that? I agree with that as well, yes. Well, didn't the evidence prove exactly the contrary? I mean, that's what the problem is here, that the opinions relied on and had within them statements that were not consistent with what the facts of the BPPs were. Respectfully, again, and we have it cited fully in our brief, the reviewing companies and firms and the testifiers for the federal government agreed that there was a real risk that these policies covered, things such as, you know, disappearance of a main supplier, et cetera. But they found there was no transfer of risk. Well, all of the companies are – I'm sorry, the three reviewing firms said there was a transfer because risk was transferred from the – Well, they didn't, though. The three reviewing firms did not say there was a transfer of risk. In fact, that's the very reason why one of the firms pulled out when it discovered there was no transfer of risk. Respectfully, I believe it wasn't because there was no transfer, because clearly the company that was purchasing the insurance transferred the risk to either Fidelity Insurance or Citadel Insurance because those insurance companies agreed to cover those risks. And there was then – so there was transfer of risk and transfer of real risk. And then there was – How many claims were made on the policies in all of the years? Five. Five claims were made, and there were about five policy years. These were new policies. One of those claims was not paid because it was below the deductible. The other four were paid. And again, we cite to that in our brief as well. So risks were transferred and they were covered. In short, the only discrepancy between the way the plan was administered and the legal opinion was an accounting difference in which the Fidelity Insurance company would remit to the reinsurer the amount that it was due at the end of the policy period rather than earlier. But even the government's witnesses, the experts, agreed that in the end all of the money went to where it was supposed to go. So the risks were all covered. The big issue, again, Mr. Crithfield has been charged with intentionally trying to defraud the U.S. government. Here's a situation where there's no evidence that he understood the tax law, that he was into the details of how any of this worked. He was seeing these three major opinions. More than 100 sophisticated purchasers bought these policies. 230-odd policies were sold. Tax advisors, CPAs, none of them complained there was anything wrong with this. Mr. Ray, you've saved a couple of minutes for rebuttal. Yes, sir. Thank you. I yield to Mr. Fallgatter. Good morning, Your Honors. Curtis Fallgatter. Those five minutes go by pretty fast. With your permission, I'll start. I think the fundamental issue for Mr. Donaldson starts with the proposition of the finding of the trial court that he lied to the lawyers, as you just kind of asked Mr. Ray about. It was a bench trial, so it was very unique, which I suspect there's been a lot of defendants who find themselves innocent defendants convicted by a jury based on erroneous findings of the jury. Here we have, as you know, written findings of fact because it was a bench trial. Those findings of fact that were particularly fatal to Mr. Donaldson was the finding that he had lied to the lawyers. There was absolutely no evidence to even talk to the attorneys who wrote those opinions, let alone that he lied to them. So, you know, that was a shocking finding of fact to see in the opinion. The harm from that error was twofold, and it went to the heart of both of our key defenses, which was the advice of counsel, which all due respect, the trial court forgot that we raised, and the other, of course, was the Parker defense that this court, of course, has addressed. The verdict specifically said that defendants... There's no such thing as a Parker defense. I'm sorry? There's no such thing as a Parker defense. I mean, the notion that just because you're a salesman that that's a defense is not a defense, that's not a defense. I mean, the question is whether the evidence supports the charge or not. That's what, that's all Parker was really about. Well, maybe I misread Parker, and I apologize if I'm using the wrong... Don't be the first. We've had that happen before. Here's what I understand why Parker would apply to Mr. Donaldson, if I might address that issue. As I understand Parker, there were some salesmen that were selling, I think, bonds, and they were working for a gentleman who told them that there were X number of bonds back in a vault, as I recall, and they went out and marketed more bonds than were really back in that vault. And so they were misrepresented, and your court concluded that they could not possibly form a criminal intent to defraud if they didn't know the underlying basis of the fraud. That's precisely what we're dealing with here, except with even stronger grounds, because in this case, Parker, the Parker folks heard verbally from their boss that there were sufficient bonds back there. Here, Mr. Donaldson had an eight-page written opinion that specifically authorized every word that he ever said at a presentation. It came from a reputable law firm. It's an opinion that the government does not challenge. All of his PowerPoints that he used in the conferences were approved by those law firms, and those law firms actually sat in the audience and even bought policies from them. So, you know, I would ask the court to look at the judge's statements in the verdict, which really emphasized what I have called this, I guess I'll call it a salesman offense, so I don't offend the court. And on that point, the judge concluded that he could not see the crime if one were to assume a valid insurance policy, as Mr. Donaldson most certainly was entitled to do based on his legal opinion. And more to the point, the verdict said, assuming the bona fides of the insurance program, again, which Mr. Donaldson was entitled to do because he had no involvement with the implementation or operation of the insurance companies, the government's $1.5 million expert testified that Donaldson had no  Did the lawyers from Lord Bissell and Brooke discuss their concerns about their earlier letter with Donaldson? Very briefly. And, of course, the concerns Explained why they were withdrawing their opinion? They explained that they had a new senior attorney that had come in and wanted to review it. They were unhappy with some of the tax accounting issues. Steve Donaldson stopped selling the product immediately in the record, or as a letter he sent to all of his sales force to cease and desist selling it. It appeared to me that this record would support this notion, that Lord Bissell and Brooke explained to Donaldson and Crithfield the problems with their earlier letter, the misrepresentations that it was based on, withdrew that new letter from a new firm based on the same misrepresentations. And if the evidence supports that, it seems to me your client doesn't have a defense. The evidence does not support that. And any discussion with Donaldson was very cryptic about how he was implementing the sales program. He didn't own the companies. All the representations Didn't Walsh testify that your client acknowledged that the business protection plans would be, quote, an insurance scam, unquote, if the insureds were incentivized not to file claims? My client, in every single PowerPoint he did, every single presentation, told everyone to file claims. And so Well, so you agree with what I just said then, right? That your client acknowledged that it would be an insurance scam if they were incentivized not to file claims. I don't believe he ever said that. I think what he did say is I've told people to file claims if it's necessary to file claims. Sometimes there would be a business purpose for them not to file because the plan the Lord Bissel had approved and every one of the three law firms approved is that if they didn't file a claim, 85 percent of the policy premium would come back to them. So the business person had to analyze what the particular claim was and juggle the numbers to determine whether it was in their best interest. Like a lot of us, you may not file a homeowner's claim because you'll pay the $1,000 deductible. And so there were business purposes for why people might not file claims. Okay. You've saved a few minutes for rebuttal, Mr. Fallgatter. So let's hear from the government. Ms. Bodner. May it please the Court, Roberta Bodner for the United States. Viewing the evidence in this case in the light most favorable to the United States, the trial court's verdict is overwhelmingly supportive, including its finding that the defendant's reliance on these law firm opinions did not give them a shield from their knowing commission of this offense. Advice of counsel is only available as a defense if you actually follow what counsel says, if you actually rely and do what they say. They didn't. They implemented a scheme that was entirely different from the one that the court calculated because the insurance companies were not independent, because they were not capitalized, because these business premiums were not calculated at arm's length in an actual market. Walsh and Babel and Dubinsky all calculated out for the court in a  Walsh told us that there was no transfer of risk when you actually looked at the size of the premium, which they had not done in that first opinion that started at Morris Manning and went to LBB. They didn't know what the size of the premium was, and the size of the premium was critical because it was one-third the amount of the actual business risk policy. And that meant that when Fidelity saved back 5% of the risk and transferred the rest to this illusory company called FedRay, 5% was a whole lot. They saved just as much in premium as they supposedly transferred, so the mathematics did not work. If these policies had actually been calculated at arm's length, they wouldn't be a 33% premium to risk covered. They would have been something like 1% to 2%, which is what Walsh testified to and what Babel testified to. But the fact of the size of the premiums, which, by the way, was determined by the taxpayer based on the amount of money they wanted to shelter, because of that critical fact, there was no transfer of risk anywhere, and all three of those witnesses testified to that. Expert testimony about that, right? Yes. Which the district courts freed their credit. That's right. There's expert testimony about that, which the court was free to credit, and the court was free to credit Walsh's testimony that Donaldson told him, of course not, it would be an insurance scam if the business owners had an incentive not to file a claim. Criffield's counsel told you that there were five claims filed. Our brief addresses in the statement of fact the exact number of claims that were filed by the Salty Brine folks after the search warrant was executed, so everyone knew that the game was up at that point. There was one claim filed by Florida radiologists that was paid for out of the businesses' own assets. So when a claim was filed, it worked exactly as we told the district court at trial that it worked. The businessmen covered the claim, and so it was self-insurance. And because it was self-insurance, and because the defendants knew it was self-insurance, this was a tax fraud. Donaldson talks about his salesman defense and his lack of involvement in the company, but if you listen to the transcripts, which are 77T1 and T2, he starts right off the bat saying this is a family business. Dwayne Criffield is my business partner, and together we started Foster and Fidelity Trust and Fidelity Insurance and OTS and Citadel. And the documents establish that Donaldson was involved, although I agree that they're very, very complex and hard to follow, and that was intentional. All in all, the evidence fully supports the district court's finding that this was a scam and they knew it. And when it comes to the Parker defense, whatever they want to call it, it's all about knowledge, and there's abundant proof of that. I mean, that's just a case where we said there was insufficient evidence. Yes, insufficient evidence that the salesman knew that the fraud was going on. So just begs the question, well, was there sufficient evidence here? Of knowledge here. And the court in its — this is sort of an odd posture because you have this extraordinarily long verdict with specific findings of fact, and it's an advantage to us and an advantage to the court knowing exactly what the district court was thinking. But everything that the district court thought in that order is amply supported by the facts, and he even points you to the record where those facts are supported, as do we. Unless the court has other questions about specific facts, I will rely on my brief. Thank you, Ms. Bodnar. Mr. Wray, you've got two minutes. Thank you, sir. Your Honor, just briefly, again, I'd like to focus back on Mr. Crithfield, my client, and his involvement. As you're aware, he was a stockholder in these various companies and also at various times he was an officer in some of the companies. But there is absolutely no evidence anywhere in the record concerning what degree of detail he was familiar with how any of these programs worked. The representations made to the various insurance — the various law firms were made by — when you look at the record, they're made by Keith Lake, who was an attorney that was affiliated with Fidelity Insurance and some of the other companies. They were not made directly by Mr. Crithfield. As a matter of fact, there's no evidence whatsoever that Mr. Crithfield made any false representation to any of the law firms. All we know is — Was he not copied on emails and did he not participate in phone calls concerning the tax opinions? I'm sorry, was he asked not to — Wasn't he copied on emails and didn't he participate in phone calls concerning the tax opinions? He participated in two phone calls, and those involved, I believe, Mr. Walsh with or call it, was that Mr. Crithfield was asked to get certain information, which he did. That had to do with some fairly minor issues. Well, actually, didn't Mr. Walsh testify that in one of those calls, he expressed his concerns about how Fidelity — or one of the communications, I should say — he expressed concerns about how Fidelity did not maintain reserves for insurance losses and charged premiums of one-third of the coverage amount as a rule, which seemed high, considering that they had never had a single claim on the policies at that time? Right. He did express that concern. And, again, that was, again, reviewed by Handler, Thayer, and Duggan. And the bottom line on those, Your Honor, is that no one expressed to Mr. Crithfield that those issues would basically make this structure noncompliant with the tax law. And there's just no evidence that he knew that what was being marketed by companies that he had an interest in was a tax fraud. That's the hole in the evidence. Thank you. Mr. Fogatter. Thank you, Your Honor. Mr. Fogatter, let me ask you a question. I looked at the transcript at page 344. When a client asked Donaldson for a form to submit a claim on its insurance policy, your client responded or chuckled and said, there's no claim form. No one has ever filed a claim. The whole idea is not to file a claim. What did he mean by that? Well, first of all, that's not true. I think you're referencing, I assume you are, the testimony of Dr. Christenberry. McCoy was free to credit that testimony, wasn't he? Not if it's not supported by substantial evidence, and it was not. Christenberry was one of a hundred taxpayers. Donaldson told everyone to file claims. It's in all of his PowerPoints, at all of his conferences. Was a claim ever filed? Four or five claims were filed. And it's not Mr. Donaldson's responsibility to file it. It's the taxpayer's responsibility. Here's why that testimony was not credible. That exact same question was asked of Dr. Christenberry at a deposition four years earlier. The question was, did someone tell you the whole idea was not to file claims? No, absolutely not. He never had a claim within the time period of his insurance policy. We called Attorney Lustig, who was his attorney, who we also threw under the bus on that. He said, that's nonsense. He was never told that. The marketing materials always said to file claims. Several people did. And as I say, Mr. Christenberry is one of a hundred clients. So even if that was said to one client, it wouldn't apply to the other 99. And really, there's not substantial evidence. Christenberry, all due respect, was lying about that. Why would he lie about that? I'm sorry? Why would he lie about that? Because he was upset about having lost some money in the case. And even if you think he was lying, why was the district court not able to find him credible and rely on his testimony? You said there wasn't substantial evidence. That's not really the standard, though. I mean, what is there that makes it clear error for the district court to have relied on his testimony and found it to be credible? Because of the half a dozen different factors that demonstrated he had a motive to fabricate and did, including direct testimony that he gave in a deposition four years earlier, diametrically opposite of what he said at the hearing. His attorney testified and confirmed that that was a false claim that he was making. And again, it's only one of a number. And the other sort of fundamental thing that feeds into all this is, you know, we've been convicted of tax fraud. If there's a defect in the insurance issue, that doesn't necessarily mean that you're trying to defraud IRS. And let me go back to the question, Judge, prior to this you asked about the Lord Bissell. Mr. Donaldson was not involved in any representations to any of the law firms about the formation of their business model. Walsh testified on cross-examination that every concern that he belatedly asserted because they were worried about some liability was refuted by the opinion that they had written. Every single component that he was concerned about, which he, all due respect, fabricated, he acknowledged on cross-examination was squarely within the four corners of the opinion that they had rendered. And again, I hearken back to my comment that when there was a concern by Lord Bissell, Mr. Donaldson immediately stopped. Crooks don't do that. Folks intent on defrauding IRS don't do that. He immediately stopped the sales. Several months later, the HTT opinion was rendered. And that's the basis of the trial court's finding that we lied to a lawyer. It was Duggan with Handler, Thay and Duggan, and that policy operated for the next two or three years. Duggan attended the conferences. He approved all the PowerPoints. So our advice of counsel defense really applies to the bulk of the sales that occurred under the HTT opinion. Okay. We have your case, and we'll take it under submission. Thank you. Thank you, Your Honor. Thank you. Taylor v. Fred Zink. Thank you.